**United States District Court**
For the Northern District of California

1
2
3
4
5
6           IN THE UNITED STATES DISTRICT COURT
7
8           FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10    IN RE ZORAN CORPORATION                    No. C 06-05503 WHA
11    DERIVATIVE LITIGATION
12    _____        **ORDER GRANTING IN PART
                                                 AND DENYING IN PART
13    This Document Relates To:                  MOTION TO STRIKE AND
                                                 GRANTING IN PART AND
14    ALL ACTIONS                                DENYING IN PART MOTION
                                                 TO DISMISS**
15    _____/
16
17                          **INTRODUCTION**
18          In this shareholder derivative action alleging backdating of stock options, individual
19    defendants and nominal defendant move to dismiss plaintiff's consolidated verified derivative
20    complaint.  The complaint alleges claims under Section 10(b), Section 14(a) and Section 20(a)
21    of the Securities Exchange Act of 1934 as well as a number of claims under Delaware state law.
22    Because this is a derivative action, plaintiff is required to either make a demand on the board or
23    adequately plead why such demand was excused.  This order holds that plaintiff has succeeded
24    in pleading that demand was excused under Delaware law.  Plaintiff has pled with particularity
25    facts that, if true, would show that a majority of Zoran's directors received backdated stock
26    options, thus they engaged in self-dealing.
27          Turning to the merits of plaintiff's securities claims, this order further holds that plaintiff
28    has pled all the necessary elements of a claim under Section 14(a).  Plaintiff has also pled

**United States District Court**
For the Northern District of California

1   claims under Section 10(b) against defendants Gerzberg and Schneider.  Plaintiff has not stated

2   a claim for control-person liability under Section 20(a) because he did not allege facts that there

3   were any primary violators controlled by Gerzberg and Schneider.  As to the Delaware state law

4   claims, plaintiff has stated claims for breach of fiduciary duty based on the granting of

5   backdated stock options and based on insider trading, corporate waste and unjust enrichment.

6   Plaintiff has failed to plead claims for aiding and abetting breach of fiduciary duty, constructive

7   fraud, gross mismanagement, abuse of corporate control, and rescission.  Plaintiff's motion to

8   strike exhibits to the declaration of Felix Lee is **GRANTED IN PART AND DENIED IN PART**.

9   In sum, nominal defendant's motion to dismiss for failure to make demand will be

10   **DENIED**.  Once plaintiff makes conforming amendments to the complaint, as explained below in

11   this order, then plaintiff will have successfully pled that demand was excused.  Individual

12   defendants' motion to dismiss under Rule 12(b)(6) is **GRANTED IN PART AND DENIED IN PART**.

## STATEMENT

14   By now, the story of stock-options backdating is familiar.  A year ago, a series of

15   articles noted extraordinary returns on stock options granted to officers, directors and

16   employees of some companies.  A suspiciously high number of options were ostensibly granted

17   at times where stock prices were at periodic lows followed by sharp increases in price.  Such

18   patterns were particularly common in the high-technology sector.  These articles noted that the

19   chances of such exquisite timing were slimmer than winning the lottery, and for some

20   company's patterns, much slimmer than winning the lottery several times over.  Eventually it

21   was determined that such buy-low-sell-high returns simply could not be the product of chance.

22   In some instances, the grant dates were obviously backdated to maximize returns for the

23   grantees and minimize the compensation expense reported by the company.[1]

24   Normally, a company grants stock options to its officers, directors and employees at a

25   certain exercise price giving the recipient the right to buy shares at that price (once the option

---

[1] *See* Charles Forelle and James Bandler, *The Perfect Payday*, Wall St. J., March 18, 2006, at A1; Randall A. Heron and Erik Lie, *What Fraction of Stock Option Grants Have Been Backdated or Manipulated?* (July 14, 2006), *available at* http://www.issproxy.com/pdf/OptionsBackdatingStudy071406.pdf (estimating that 18.9% of unscheduled, at-the-money grants given to top executives between 1996-2005 were backdated or otherwise manipulated).

has vested).  If the stock price rises, the options have value.  Once exercisable, the options are worth the difference between the exercise price and the current market price.  If the stock price falls, the options are worthless.  Options with an exercise price equal to the stock's price as of the grant date are referred to as "at-the-money" options.  Those with an exercise price lower than the stock's market price are referred to as "in-the-money" options.

One key aspect is the financial reporting of options.  For financial reporting purposes, companies granting in-the-money options have to recognize compensation expenses equal to the difference between the market price and the exercise price.  No compensation costs need be recognized for at-the-money options, for the company does not forego any revenue by granting them.  The motive for backdating is to avoid a "hit to the earnings," *i.e.*, a compensation expense, while still awarding in-the-money options.  Those responsible simply backdate the grants to a date where the stock price was attractively low and pretend that the grant was awarded on the earlier date rather than the real date.  Since the paperwork shows that the exercise price is the same as the market price on the phony grant date, they pretend no need exists to recognize an expense.

The price on the true grant date, of course, is higher than the price on the phony grant date.  The company is in effect granting in-the-money options without recognizing the attendant compensation expense.  Because the company is underreporting its compensation expenses, the company's earnings appear higher than they truly are.  The company also receives a lower price in exchange for the options than it would if the price were measured from the proper grant date.

Options pricing also has tax consequences.  Under the so-called "million dollar rule," publicly-held companies do not pay taxes on the first one million dollars in non-incentive-based compensation paid to an employee.  26 U.S.C. 162(m).  At-the-money options are incentive-based compensation.  In-the-money options are not incentive-based compensation to the extent of the difference between the exercise price and the market price.

## 1. ZORAN CORPORATION.

On May 16, 2006, the Center for Financial Research and Analysis issued a report titled "Options Backdating — Which Companies are at Risk?" (Lee Decl. Exh. B).  The report

United States District Court

For the Northern District of California

1   identified a number of companies concentrated in the high-technology sector at risk for having

2   issued backdated stock options.  Zoran was among them.  The report identified three specific

3   suspect grants.  These were purportedly made on August 4, 1998, August 4, 1999, and

4   September 19, 2001.  Zoran responded in a press release dated May 23, 2006, stating that the

5   company had conducted an internal investigation that had concluded that no grants were

6   backdated (Compl. ¶ 71).

7        Nonetheless, Zoran formed a committee of outside directors on July 3, 2006, to

8   investigate the company's historical options granting practices (Compl. ¶¶ 299–300).  The

9   committee consisted of directors David Rynne and Ray Burgess.  The company also announced

10  that it had received an informal inquiry from the SEC and the United States Attorney's Office

11  regarding its options-granting practices (*id*. at ¶ 73).  Because of the ongoing investigation,

12  Zoran delayed in issuing its financial reports.  This caused Zoran to be faced with possible

13  delisting from the NASDAQ.  As a result of Zoran's investigation, on December 22, 2006,

14  Zoran's CEO Levy Gerzberg and CFO Karl Schneider made Form 4 filings with the SEC that

15  repriced some options granted to them (*id*. at ¶ 80).[2]

16       The final results of Zoran's internal investigation were announced on February 20, 2007.

17  A press release stated that there was no evidence of wrongdoing by any member of the

18  company's senior management.  Some grant dates, however, had been readjusted to reflect the

19  correct measurement date.  Moreover, contrary to the earlier statement, the press release

20  revealed that "the dates of a small number of stock options grants to non-executives were

21  established retroactively."  Zoran eventually restated a number of its financial statements to

22  reflect correct accounting methods.  The company took a charge of between $12 million and

23  $15 million against its earnings for the relevant time period (Lee Decl. Exh. C).  Zoran filed a

---

25  [2] When transacting in their own company's stock, directors and officers must file records of any

26  changes in beneficial ownership by filing a Form 4 with the SEC.  This includes the receipt and exercise of stock options.  With the enaction of the Sarbanes-Oxley Act in July 2002, any Form 4 had to be filed before the

27  end of the second business day after the transaction took place.  As of July 30, 2003, any Form 4 was required to be filed electronically.  15 U.S.C. 78p(a)(2)(C).  The amendments to this section were originally referred to in

28  a draft bill as "Real-Time Disclosure of Financial Information."  They were grouped together with other disclosure requirements aimed at making publicly traded companies report material information as quickly as possible.  *See* H.R. Rep. No. 107-418, at 25–26 (2002), 2002 WL 704333.

1   Form 8K to this effect on February 21, 2007.  Zoran also filed its Form 10K for 2006 on April

2   20, 2007 (Lee Decl. Exh. A).

3       **2.     THE PARTIES.**

4       Plaintiff Gerald del Rosario is a current holder of Zoran stock.  He acquired his Zoran

5   shares pursuant to Zoran's merger with Oak Technology, Inc., in August 2003 (Compl. ¶ 20).

6       Nominal defendant Zoran is incorporated in Delaware and is currently headquartered in

7   Sunnyvale.  Its stock is publicly traded on NASDAQ.  Zoran provides products and services in

8   the areas of high-performance digital entertainment and digital imaging (*id*. at ¶ 21).

9       Individual defendants are current and former officers and directors of Zoran.  They are

10  alleged to have received backdated stock options.  All board-member defendants are alleged to

11  have knowingly ratified or participated in granting backdated stock options.  Additionally, all

12  defendants are alleged to have contributed to the dissemination of false statements in financial

13  statements, proxy statements and other SEC filings during their tenures at Zoran.  For each

14  individual defendant exercising stock options, plaintiff alleges that at least some of the options

15  exercised were granted during the period in which backdating was taking place at Zoran

16  between 1997 and 2006.  For each individual defendant who sold Zoran shares during that time

17  period, plaintiff alleges that those sales included shares obtained by exercising Zoran stock

18  options.  Plaintiff alleges that defendants received money from the sale of Zoran stock.

19  Plaintiff's allegations do not trace what portion of the proceeds is attributable to the exercise of

20  allegedly backdated stock options.

21      **A.     Zoran's Board.**

22      Defendants Levy Gerzberg, Uzia Galil, James A. Meindl, Philip Young, Arthur B.

23  Stabenow, James B. Owens, Jr., David Rynne and Raymond A. Burgess were members of

24  Zoran's board at the time the complaint was filed.  All board members except David Rynne and

25  Philip Young are named as defendants in this action.  Allegations related to their conduct are

26  included, however, for the purposes of pleading demand futility.  In the complaint, plaintiff

27  explicitly states that he is alleging that each individual defendant was responsible for

28

**United States District Court**
For the Northern District of California

5

United States District Court

For the Northern District of California

misconduct that occurred during his tenure on the board and the relevant committees (*id*. at ¶ 38).

Defendant Levy Gerzberg co-founded Zoran.  He has been Zoran's president and chief executive officer since December 1988 and has served on the board of directors since 1981.  Plaintiff alleges that Gerzberg reviewed, signed and approved financial reports containing false statements and was intimately involved in the granting of backdated stock options.  Allegedly, he exercised at least 698,057 stock options, an undisclosed amount of which were granted while backdating occurred at Zoran.  He has sold at least 760,637 shares for proceeds exceeding $24 million between 1997 and 2006, the period during which plaintiff alleges that backdating occurred at Zoran (*id*. at ¶ 23).

Defendant Uzia Galil has served on Zoran's board of directors since 1983.  He was an audit committee member from 2001 through April 2006.  He has been a member of the compensation committee since at least 1996 and has served as its chairman since at least 2004 (*id*. at ¶ 30).

Defendant James A. Meindl has been a board member since March of 1986.  He served on the audit committee from 1996 though April 2005.  He has been a member of the compensation committee since April 2004.  He has sold at least 128,166 shares of Zoran stock in the last nine years, including shares obtained by exercising stock options, for proceeds of at least $4.6 million (*id*. at ¶ 31).

Philip Young has been a board member since 1986.  He is currently a member of the nominating and corporate governance committee (*id*. at ¶ 42).

Defendant Arthur B. Stabenow has been a member of the board of directors since November 1990.  He has also allegedly served on the audit committee since 1994 and has acted as its chairman since at least 2004.  He has served on the compensation committee since at least 1996.  Allegedly, he has sold at least 29,166 shares, including shares granted to him by the company as stock options, for proceeds exceeding $1.3 million (*id*. at ¶ 32).

6

United States District Court

For the Northern District of California

Defendant James B. Owens, Jr. joined the board in May 2003.  He served on the compensation committee from 2003 until April 2004.  He has been a member of the audit committee from April 2005 to the present (*id.* at ¶ 33).

David Rynne became a Zoran director in August 2003.  He joined the compensation committee on April 19, 2006 (*id.* at ¶ 41).

Defendant Raymond A. Burgess has been a member of Zoran's board of directors since April 2005.  He joined the audit committee on April 26, 2005 (*id.* at ¶ 34).

**B.      Zoran's Officers.**

The following defendants were officers of Zoran as of the time the complaint was filed.

Defendant Karl Schneider has been Zoran's chief financial officer since July 1998.  In this capacity, he reviewed and signed financial statements pursuant to the Sarbanes-Oxley Act of 2002.  He has exercised at least 113,200 stock options and has sold at least 135,339 shares since 1997 for proceeds of more than four million dollars (*id.* at ¶ 26).  Plaintiff alleges that Schneider has violated Section 10(b) of the 1934 Act together with Gerzberg.

Defendant Isaac Shenberg currently serves as a senior vice president, a position he has held since October 1998.  He has been with the company since at least August 1990 and has been an executive since January 1995.  He allegedly exercised at least 188,625 stock options and has sold at least 195,625 shares yielding proceeds of more than five million dollars (*id.* at ¶ 27).

**C.      Zoran's Former Officers and Directors.**

The following defendants are former Zoran officers and directors.

Defendant Aharon Aharon served as a vice president and senior vice president at Zoran in various capacities from February 1997 through October 2001.  From October 1998 to October 2001, he was Zoran's senior vice president and chief operating officer.  Plaintiff alleges that Aharon exercised at least 126,041 stock options, some of which were granted during the time stock options backdating allegedly occurred at Zoran.  He sold at least 130,886 shares, including shares obtained by exercising options, for proceeds exceeding $4.9 million (*id.* at ¶ 22).

United States District Court

For the Northern District of California

Defendant Paul R. Goldberg served as a vice president in various capacities from approximately June 1996 through January 2001. He exercised at least 23,750 stock options, some of which are alleged to have been granted while backdating took place at Zoran. Since 1997, he has sold at least 53,427 shares for proceeds exceeding two million dollars (*id*. at ¶ 24).

Defendant Camillo Martino was Zoran's executive vice president and chief operating officer from August 2001 through July 2005. During that time, he exercised at least 65,022 stock options. He has sold at least 32,601 Zoran shares since 1997, including shares obtained by exercising stock options, for proceeds exceeding $840,000 (*id*. at ¶ 25).

Defendant Alex Sinar joined Zoran in 1990 and served as its vice president of operations from February 1997 to February 1999. He is alleged to have exercised at least 24,000 stock options during that time. He is alleged to have sold 23,625 shares of Zoran stock for at least $1.2 million (*id*. at ¶ 28).

*                    *                    *

Many claims are asserted against only some of the individual defendants. The complaint groups the defendants according to their roles at the company. The "compensation committee defendants" are Galil, Meindl, Stabenow and Owens. The "audit committee defendants" are Galil, Meindl, Stabenow, Owens and Burgess. Galil, Meindl, Stabenow, Owens and Burgess are also referred to as "director defendants." Aharon, Gerzberg, Goldberg, Schneider, Shenberg, Sinar, Meindl and Stabenow are called the "insider-selling defendants."

**3.    PROCEDURAL HISTORY.**

The first complaint in this action was filed on September 7, 2006, by plaintiff Milton Pfeiffer. Del Rosario filed his complaint shortly thereafter, and the cases were consolidated. An investor-class securities action was also filed around the same time but was voluntarily dismissed before the first round of motions to dismiss was heard. Del Rosario was appointed lead plaintiff on January 18, 2007, and lead counsel was selected on February 14, 2007.

Plaintiff filed his amended consolidated verified derivative complaint on March 14, 2007. It alleges securities claims for violations of Section 10(b), Section 14(a) and Section 20(a) of the Securities Exchange Act of 1934. Also, it alleges Delaware state-law claims of

**United States District Court**
For the Northern District of California

1   (1) breach of fiduciary duty for granting backdated stock options; (2) breach of fiduciary duty

2   for insider selling; (3) aiding and abetting breach of fiduciary duty; (4) unjust enrichment;

3   (5) constructive fraud; (6) abuse of control; (7) corporate waste; (8) gross mismanagement; and

4   (9) rescission.

5       A hearing was held on defendants' motion to dismiss on May 17, 2007.  Parties were

6   requested to submit additional information regarding some of the allegedly backdated stock

7   options grants and clarification on some of plaintiff's allegations.

8                                    **ANALYSIS**

9       A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged

10  in the complaint.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not

11  need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his

12  'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of

13  the elements of a cause of action will not do."  *Bell Atlantic, Corp. v. Twombly*, 125 S.Ct. 1955,

14  1964–65 (May 21, 2007).  "All allegations of material fact are taken as true and construed in the

15  light most favorable to plaintiff.  However, conclusory allegations of law and unwarranted

16  inferences are insufficient to defeat a motion to dismiss for failure to state a claim."  *Epstein v.*

17  *Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).

18

19                                   **PART ONE**

20  **1.      PLAINTIFF'S MOTION TO STRIKE.**

21      As an initial matter, plaintiff moves to strike Exhibits A and C to the declaration of Felix

22  Lee filed in support of defendants' reply brief.  Exhibit A is Zoran's Form 10K for fiscal year

23  2006 filed with the SEC on April 20, 2007.  Exhibit C is a copy of an exhibit to a declaration

24  filed in another action pending before this Court, *In re CNET Networks Inc. S'holder Deriv.*

25  *Litig.*, No. C 06-3817 WHA.  The exhibit is a copy of CNET's stock option plan.

26      On considering a motion to dismiss, judicial notice of the full text of documents

27  referenced in a complaint, where the authenticity of those documents is not contested, is proper

28  under the doctrine of incorporation by reference.  *No. 84 Employer-Teamster Joint Council*

9

United States District Court

For the Northern District of California

*Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 925 n.2 (9th Cir. 2003). For other publicly filed documents, "[a] court may take judicial notice of public filings when adjudicating a motion to dismiss a complaint." *In re Calpine Sec. Litig*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003).

Plaintiff argues that he could not have referenced Zoran's Form 10K for 2006 because it had not yet been filed. The complaint, however, makes reference to the document's impending filing and even suggests that plaintiff may need to seek leave to amend later in light of statements in the Form 10K (Compl. ¶ 22 n.1). Additionally, plaintiff refers to Zoran's Form 10K in his opposition arguing that Zoran admitted to several instances of backdating (Opp. 2 n.1). Plaintiff cannot be allowed to exclude the rest of the Form 10K because he wishes to pick and choose which statements should be considered. Accordingly, plaintiff's motion to strike is **DENIED** as to Exhibit A of the Lee declaration.

Turning to Exhibit C of the Lee declaration, in some circumstances, it is permissible to take judicial notice of documents filed in other actions. *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998). The two decisions defendants cite in their favor, however, do not justify taking judicial notice of a fact document filed in a wholly unrelated action. In *Reyn's Pasta Bella, LLC v. Visa USA, Inc.,* 442 F.3d 741, 746 n.6 (9th Cir. 2006), it was proper to take judicial notice of documents related to a settlement in another case that bore on whether the plaintiff was still able to assert its claims in the extant action. In *Burbank-Glendale-Pasadena Airport*, it was proper to take judicial notice of court filings in a state court case where the same plaintiff asserted similar and related claims. 136 F.3d at 1364. The instant action and *In re CNET* are not related. They are factually similar, as are nearly all backdating cases, however, they involve different parties making different allegations and asserting different claims, theories and arguments. Although the legal principles involved are the same, fact declarations from *In re CNET* are not relevant to this motion. Thus, plaintiff's motion to strike is **GRANTED** as to Exhibit C of the Lee declaration.

**United States District Court**
For the Northern District of California

2.     DEMAND FUTILITY AND RECEIPT OF BACKDATED STOCK OPTIONS.

Turning to the first main issue, nominal defendant Zoran moves to dismiss the derivative complaint for a conceded failure to make a demand.  A shareholder bringing a derivative action must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority . . . and the reasons for plaintiff's failure to obtain the action or for not making the effort."  FRCP 23.1.  "A shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile."  *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 989 (9th Cir. 1999).  "A trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences."  *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988).  Here, plaintiff does not allege that he made a demand on the board.  He instead pleads that demand was excused because it would have been futile.  "[A] court that is entertaining a derivative action . . . must apply the demand futility exception as it is defined by the law of the state of incorporation."  *Kamen v. Kemper Fin. Serv., Inc.*, 500 U.S. 90, 108–09 (1991).  Zoran was incorporated in Delaware, so Delaware law applies to this point.

Delaware courts apply two tests for determining when demand is excused.  If a derivative suit challenges an affirmative decision by a board of directors, then the plaintiff is excused from making a demand if "under the particularized facts alleged, a reasonable doubt is created that:  (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."  *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984).  A different test applies where the current directors failed to act.  "[A] court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."  *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).  To prove that demand would have been futile, the plaintiff must show that a majority of directors were not independent or disinterested.  If four members of an

United States District Court

For the Northern District of California

1    eight-member board are not independent or disinterested, demand is excused. *See Beam ex rel.*

2    *Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1046 (Del. 2004).

3         Here, plaintiff asserts that he is challenging the affirmative actions of the current board

4    members, thus the *Aronson* test applies. Plaintiff presents several theories as to how demand

5    was excused. *First*, plaintiff alleges that all current board members received backdated stock

6    options. *Second*, all board members who served on the compensation committee face a

7    substantial risk of personal liability. *Third*, all board members who served on the audit

8    committee face a substantial risk of personal liability. *Fourth*, all directors lack independence

9    because some of them are paid by the board and because some of the them have close,

10   long-standing personal relationships with Zoran executives. *Finally*, plaintiff alleges that the

11   directors failed to exercise business judgment in granting backdated stock options. This order

12   finds that demand is excused based on plaintiff's first theory and does not address the remaining

13   four.

14        Plaintiff alleges that demand was excused because each board member, even the two not

15   named as defendants in this action, received backdated stock options. This order now turns to

16   plaintiff's specific allegations related to the grant of backdated stock options.

17        A director is considered not disinterested if he or she is on both sides of a transaction,

18   that is, the director was engaged in self-dealing. *Aronson*, 473 A.2d at 812. Furthermore, "a

19   director is interested when he or she will receive a personal financial benefit from a challenged

20   transaction that is not equally shared by the stockholders." *Rales*, 634 A.2d at 936.

21   Significantly, directors receiving backdated stock options receive a benefit *not* shared by

22   stockholders. When purchasing the company's stock, the shareholders do not have the benefit

23   of reaching back in time to buy their shares at low-price point. Furthermore, if a corporate

24   decision will have a materially detrimental impact on the director, but not the corporation or its

25   stockholders, a director can be considered interested. *Ibid.* Thus, a decision now to correct the

26   grant dates would have a detrimental impact on the directors by removing the financial benefit

27   of the backdating. The director may be required to pay back the difference in price between the

28   true grant date and the purported grant date. The directors may even face legal exposure.

United States District Court
For the Northern District of California

Accordingly, if plaintiffs can plead with particularity that the directors received backdated grants, those directors will be considered interested.

In *Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. Feb. 6, 2007), a Delaware court held that knowing approval of backdated option grants by a board majority, along with intentional failure to disclose them in required financial disclosures, would excuse demand. The *Ryan* plaintiffs relied heavily on empirical analysis that compared the annualized returns calculated from the purported grant dates versus the annualized returns for the stock itself. This method was a way to measure how much financial advantage the recipient gained from receiving allegedly backdated options. The purported grant dates yielded a return higher than the stock's annualized return by a factor of ten. Additionally, the plaintiffs there alleged that stock options were not granted pursuant to an overall plan, but were granted sporadically. Here, plaintiff has retained an independent expert who performed statistical analyses of Zoran's options granting practices. Plaintiff also pleads facts regarding the stock-option plans under which the relevant grants were made.[3]

## A.    Accounting Treatment of Stock Options.

At all times relevant to this action, the reporting of expenses associated with stock options was governed by Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," and Financial Accounting Standards Board Principle No. 123. The operation of these rules was summarized in *In re CNET Networks Inc. S'holder Deriv. Litig.*, ___ F. Supp. 2d. ____, 2007 WL 1089690, *7–*9 (N.D. Cal. Apr. 11, 2007). Briefly, whether or not a company must recognize a compensation expense for stock options depends on a comparison of the option's price and the stock's market price on the measurement date of the grant. The measurement date is the date on which the following three items of information are known: (1) the number of options; (2) the options' recipients; and (3) the option or purchase price. APB 25.10(b). If, as is common, the options are granted at the market price on the date

---

[3]  Judge Maxine Chesney of our own district, however, has held that merely alleging that options were granted at a periodic low in stock price that was followed by a sharp jump in price was not sufficient to plead a pattern of backdating. More facts, including how often and at what times past stock options were granted, were needed to show a pattern. *In re Linear Tech. Corp. Deriv. Litig.*, 2006 WL 3533024 at *3 (N.D. Cal. Dec. 7, 2006) (Chesney, J).

United States District Court

For the Northern District of California

1    of the grant, the measurement date is critical for determining whether or not the company must

2    recognize a compensation expense.

3         The Office of the Chief Accountant of the Securities and Exchange Commission has

4    stated that the accounting treatment of stock options admits the possibility of innocent error

5    (Lee Decl. Exh. A, Letter from Conrad Hewitt, Office of the Chief Accountant of SEC, Sept. 9,

6    2006, *available at* http://www.sec.gov/info/accountants/staffletters/fei_aicpa091906.htm).  Not

7    each and every single instance where a company has chosen the wrong measurement date is

8    necessarily a case of backdating.  Use of an incorrect measurement date for stock options could

9    be the result of innocent but sloppy accounting practices rather than a fraudulent effort to

10   retrospectively change the grant dates.  The Office of the Chief Accountant recognized that

11   determining the correct measurement date is a fact-specific endeavor.  So too is pleading with

12   specificity that stock options were backdated.

13                    **B.      Plaintiff's Methodology.**

14        Del Rosario posits that his allegations rely on an independently retained (but

15   unidentified) expert who allegedly used peer-reviewed, academically accepted methods.

16   Although the methodology is not entirely revealed, that omission is cured by other

17   circumstances of record.

18        Plaintiff used Thompson Insider Financial Monitor, a for-profit research service, to

19   assemble a list of 32 grants to directors and officers between 1996 and 2005.  At the hearing,

20   plaintiff's counsel stated that these 32 were the only grants on the public record that went to

21   officers and directors in that time frame.  Plaintiff's expert performed an analysis on those

22   grants.  The stock's price on the reported grant dates was ranked against all of the other trading

23   days within the same calendar month.  The results revealed a range of ranks.  Several grants

24   were ranked first, *i.e.*, at the lowest price within the month; some were ranked at the highest

25   prices in the month.  Of the 32 grants, seven fell on the date with the lowest price in the

26   calendar month while another three fell on second-lowest price date in the month.  Simplifying

27   calculations by assuming twenty trading days within a month, plaintiff's expert opined that the

28   odds of seven of 32 grant dates falling on the most favorable date (out of twenty possible dates)

**United States District Court**
For the Northern District of California

1   was one in 1,151 (Compl. ¶ 116).  Three more of the grants fell on the date with the second

2   most favorable price for a total of ten of 32 falling on the top two most favorable grant dates.

3   The odds of that pattern occurring were allegedly one in 1,235 (*ibid.*).

4          Although the expert's allegations do not fully explain the math, we can readily see that

5   for any one grant, the odds of randomly choosing the most favorable grant date out of twenty

6   possible dates in the month would be one in twenty.  If this experiment were repeated 32 times,

7   on average, around two perfect picks would be expected.  Hitting the most favorable date seven

8   times out of 32 is a striking pattern (even without taking into account the three instances of

9   hitting the second best).  The Court agrees that this pattern seems hugely suspicious.  Note,

10  moreover, that 24 of the 32 grants were made before Sarbanes-Oxley and its requirement that a

11  Form 4 be filed within two business days of the grant, a significant timing factor to examine for

12  the grants made after Sarbanes-Oxley, as discussed below.

13                **C.     The Allegedly Backdated Grants.**

14         From 1997 through 2005, stock options were granted according to two different plans.

15  The 1995 directors' stock option plan governed grants to directors.  Under that plan, directors

16  on the board at the time the plan became effective were each then given 20,000 options.  Each

17  director subsequently elected to the board would be given 20,000 options on joining the board.

18  Directors who had served on the board for at least six months continuously were also given an

19  annual option grant on the trading day immediately following the annual board meeting

20  (Lee Decl. Exh. K at D-4).  This will be referred to as the 1995 fixed-date plan.  Significantly,

21  grants under the 1995 fixed-date plan were made according to a schedule on specific,

22  predetermined dates.  Because grant dates under the 1995 fixed-date plan were set long in

23  advance, it would be harder to backdate the grants, although conceivably it could still be done.

24  Plaintiff must plead more than mere stock-price movements and statistics to plead that grants

25  under the 1995 fixed-date plan were backdated.  *See In re CNET Networks, Inc.*, 2007 WL

26  1089690 at *11–15.

27         By contrast, the 1993 stock-option plan governed most other options.  Under that plan, a

28  committee of the board of directors had authority to decide the dates, recipients, amounts and

United States District Court

For the Northern District of California

1   prices of options granted under the plan (*id*. at Exh. K at B-3). Thus, for grants under the 1993

2   discretionary plan, grants were made sporadically at whatever time the committee felt

3   appropriate. This will be referred to as the 1993 discretionary plan. This inherent flexibility in

4   choosing grant dates lent itself to possible backdating.

5          The final two grants that plaintiff alleges were backdated were made under a third plan,

6   the 2005 plan. Under the 2005 plan, the compensation committee had the authority to decide

7   when grants to both Zoran's employees and Zoran's board of directors would occur. That is,

8   under the 2005 plan, there were no predetermined dates on which board members, or anyone

9   else, would receive stock-option grants. Like the 1993 discretionary plan, the compensation

10  committee had discretion to determine those dates (Lee Decl. Exh. O).

11         Of the seventeen grants that plaintiff alleges were backdated, eleven of them were made

12  under the 1993 discretionary plan. The majority of these options were granted to Zoran

13  employees. The dates of these grants were January 2, 1997, May 6, 1997, January 26, 1998,

14  August 4, 1998, August 4, 1999, October 11, 1999, July 28, 2000, March 16, 2001, August 21,

15  2001, September 19, 2001, and August 9, 2002. Amazingly, nine of these eleven grants were

16  made on dates where the stock price was at the lowest or second-lowest price in the calendar

17  month. The remaining two, granted on January 26, 1998, and August 9, 2002, were ranked

18  sixth-lowest and fourth-lowest respectively. All eleven were made before reporting

19  requirements under Sarbanes-Oxley went into effect. For all of these eleven grants, plaintiff

20  alleges that the stock price increased sharply after the purported grant date. Coupled with the

21  statistical pattern of favorable grant dates and the fact that the grant date could be chosen at the

22  will of the compensation committee, plaintiff has plainly succeeded in pleading that these grants

23  were backdated.[4] As discussed below, plaintiff acquired his stock on August 11, 2003, so he

24  does not have standing to seek recovery on grants before that date. Plaintiff, however, can refer

25

26  _____

27         [4] The 1995 fixed-date plan governed grants to directors. Grant dates were set far in advance, sometimes by several years. For instance, all directors would receive a grant of options on joining the board in addition to annual grants on the business day following Zoran's annual meeting. Under the 1993 discretionary

28  plan, the compensation committee had the ability to choose whatever grant date it wished. Grant dates were not determined in advance and were decided on an *ad hoc* basis.

1   to these pre-August 11, 2003, grants to establish the predisposition of management to engage in

2   backdating.

3        These grants were received by defendants Aharon, Schneider, Gerzberg, Goldberg,

4   Stabenow, Shenberg, Sinar and Martino.  Of these defendants, however, only Gerzberg, Zoran's

5   chief executive officer, and Stabenow were members of the board at the time the complaint was

6   filed.  Gerzberg, as an officer, received several of those grants.  Stabenow allegedly received a

7   grant of 2500 options because of his role at Zoran as a consultant.  Plaintiff has pled that

8   Gerzberg and Stabenow stood on both sides of the transaction.  That only Gerzberg and

9   Stabenow received these grants does not mean the rest of the board is in the clear.  The striking

10  pattern found in plaintiff's allegations demonstrates a predisposition to use backdated stock

11  options going as far back as 1996.  Still, to this point, plaintiff has only pled that two of eight

12  Zoran board members *received* backdated options.  Also, as described below, our immediate

13  plaintiff lacks standing to seek recovery on these grants.  They each took place before he

14  acquired his stock on August 11, 2003.  It remains, however, that these allegations show that

15  Zoran had a predisposition to grant backdated options.  This order now turns to stock options

16  granted after Sarbanes Oxley.

17                          *        *        *

18        Each of the above-mentioned grants was made before the Sarbanes-Oxley Act of 2002

19  went into effect.  Publicly-traded companies have long been required to report changes in

20  beneficial ownership of securities to insiders.  After Sarbanes-Oxley, however, companies were

21  required to file a Form 4 within two business days to report such transactions.  15 U.S.C.

22  78p(a)(2)(C).  Before Sarbanes-Oxley, therefore, backdaters could look backwards over a wider

23  range of dates to find the most favorable price.  Sarbanes-Oxley limited that period to two days

24  if a Form 4 was timely filed.

25        This is not to say that backdating is completely impossible within a two-day window

26  (particularly when there are intervening holidays), but only to say that on any given business

27  day, the range of phony dates is restricted to only two for those who file *on time*.  In order to

28  reach back to even earlier phony dates, the Form 4 filer must submit the form late.  Therefore, a

late-filed Form 4 is a red flag.  Particularly where there is no other indication that the grant was publicly disclosed before it was reported to the SEC, a late-filed Form 4 is a warning indicator of backdating.

The two-business-day reporting requirement under Sarbanes-Oxley rendered obsolete the statistical method of looking to see how many grants occurred on the most favorable (or second-most favorable) grant date of the month.  Management no longer has the latitude to backdate as far back.  The Form 4 requirement has cramped their style.  Backdaters must now work with the two-day window plus the one or more late days they think will be overlooked. So, because those selecting grant dates after Sarbanes-Oxley had a shorter window in which to find the most favorable price, it makes more sense to look at the stock price over a shorter period of time when evaluating whether grant dates were backdated for pleading purposes.  That a grant date turns out *not* to be the one most favorable in an entire month does not mean much. After Sarbanes-Oxley, smaller movements in the price between the grant date and the disclosure date gather importance.

This order now takes a closer look at six other grants, all made to board members, after Sarbanes-Oxley.

### (1) *April 29, 2003.*

On April 29, 2003, an options grant was made to defendant and board member Owens. Plaintiff admits in his opposition that he did not plead specific facts regarding this grant.  At best, he merely pled that Owens was granted some stock options and that they must have been backdated.  Plaintiff does not even plead any facts as to price movements.  Indeed, plaintiff admits that this grant occurred on a date that was quite unfavorable to the optionee.  Plaintiff has failed to plead that this grant was backdated.  (The post-hearing submission is not sufficient either.)

### (2) *July 17, 2003.*

Another allegedly backdated grant occurred on July 17, 2003, to board members Meindl, Stabenow, Galil and Young.  Ordinarily, this grant would have been made under the 1995 fixed-date plan on the business day following the annual meeting.  Instead it was made under

18

1   the 1993 discretionary plan.  That year, the annual shareholder's meeting took place on August

2   8, 2003, at least two weeks after the grant was made.  Between those dates, the stock price rose

3   by approximately three dollars.  The 1995 fixed-date plan had allegedly been suspended, and

4   plaintiff pled that Form 4 filings for those grants were late (Compl. ¶ 250–251).

5          In supplemental briefing, plaintiff now admits that the Form 4 filings for this grant were

6   submitted at 9:41 p.m. on July 21, 2003 (Farris Decl. Exh. 3 at 6 n.22).  This was after the

7   close-of-business at the SEC.  They were deemed electronically filed with the SEC the next day,

8   on July 22, 2003.  July 17, 2003, fell on a Thursday, while July 21, 2003, was the following

9   Monday.  This was timely.  Moreover, the stock price on July 22, 2003, was *lower* than on

10  July 17, 2003.  Accordingly, plaintiff has failed to show facts that would indicate that this grant

11  was backdated.

                          **(3)      *June 21, 2004*.**

13         Plaintiff also alleges that the grant allegedly made on June 21, 2004, to defendants Galil,

14  Stabenow, Owens, Meindl, Rynne and Young, all board members at the time, was backdated.

15  Defendants argue, and plaintiff does not dispute, that this grant was timely made under the 1995

16  fixed-date plan.  The annual meeting for 2004 took place on Friday, June 18, 2004 (Compl.

17  ¶ 243).  The next trading day was Monday, June 21, 2004.  Each director receiving these grants

18  filed a Form 4 with the SEC within two business days of the grant date (Lee Decl. Exhs. R, S).

19  Plaintiff has not properly pled that this grant was backdated.

                          **(4)      *April 26, 2005*.**

21         Defendant Burgess received an options grant dated April 26, 2005, in connection with

22  his appointment to the board.  Plaintiff alleges that Burgess "has been a member of Zoran's

23  board of directors since April 2005 and a member of the Audit Committee since April 26, 2005"

24  (Compl. ¶ 34).  Plaintiff concedes in his opposition that this grant was made under the 1995

25  fixed-date plan.  A Zoran press release dated April 27, 2005, announced Burgess' appointment

26  to the board.  Between April 26 and April 27, the stock price rose by nine cents per share.

27         It is worth noting that the deadline for filing a Form 4 for *initial* director grants is ten

28  business days, not two business days.  15 U.S.C. 78p(a)(2)(B).  When a director joins the board,

                                          19

United States District Court

For the Northern District of California

1   or when an officer first joins the company, he or she has ten days within which to report

2   changes in beneficial ownership of securities by filing a Form 4.  For this grant, Burgess filed a

3   Form 4 on May 6, 2005, which is within the ten-day window for reporting such grants.  No

4   negative inference can be drawn from Burgess' filing disclosures.  The bottom line is that this

5   grant seems to have been nothing more than the formulaic grant made to all directors upon

6   joining the board.  Backdating is not indicated.

7                           **(5)**      ***August 19, 2005.***

8            On August 19, 2005, the compensation committee allegedly granted options to

9   Gerzberg, Schneider and Shenberg under the 2005 plan.  Like the 1993 discretionary plan, the

10  2005 plan gave the compensation committee the power to decide the grant date, recipient,

11  amount and prices of options.  Here, however, the Form 4 deadline was met (Lee Decl. Exhs. P,

12  Q).  Plaintiff has not successfully pled that this grant was backdated.

13                          **(6)**      ***November 23, 2005.***

14           Here, plaintiff has a stronger case.  On November 23, 2005, Galil, Stabenow, Owens,

15  Meindl, Rynne, and Young were granted options.  This was a large grant to all directors of

16  15,000 shares (in options).  They were made under the 2005 plan.  Under that plan, grants of

17  stock options to all directors were *discretionary*, that is, the compensation committee could

18  decide the date on which options were to be granted.  Moreover, all Form 4 filings for this grant

19  were filed on December 1, 2005 — three business days late.  November 23, 2005, fell on a

20  Wednesday.  The next day was the Thanksgiving holiday, so the markets were closed.  The next

21  business day was Friday, November 25.  Each recipient should have filed a Form 4 by the close

22  of business on Monday, November 28, 2005.  Instead they were filed on Thursday, December 1.

23           This grant, however, was publicly disclosed in a Form 8K filed by Zoran on

24  November 30, 2005.  Even so, that disclosure was notably outside the two-business-day period.

25  On November 23, the price of Zoran stock was $16.36.  This was the lowest price within the

26  week before the grant was disclosed.  The price rose through the intervening days, and by

27  November 30, the price was $16.92.  This represents an increase of $0.56 per share.  Each

28  grantee received 15,000 shares, resulting in a difference of $8400 to each director.  Given the

United States District Court

For the Northern District of California

1    size of this grant, given the delay in disclosing it under Sarbanes-Oxley, given that the

2    "discretionary date" plan was used, and given the predisposition of management to backdate, as

3    revealed in the grants from 1996 to 2005 (summarized above), this order holds that plaintiff has

4    shown particular facts that would warrant the conclusion, at the pleading stage, that this grant

5    was backdated.

6        Defendant also argues that plaintiff has not alleged facts that would show personal

7    benefit that would be "material" to the directors, *i.e.*, that the directors were sufficiently rich

8    that any backdated options were mere pocket change.  That does not matter here.  Simply put,

9    backdating is a form of fraud.  The directors stood on both sides of this transaction.  Those in

10   charge have caused the company to disseminate false statements, or so plaintiff alleges.

11   Plaintiff does not have to show that the fraud reaped material benefits for the directors over and

12   above their net wealths.

13       Plaintiff did not plead these specific facts surrounding this grant in his complaint.  They

14   were presented during oral argument and in supplemental briefing.  Plaintiff will be allowed

15   leave to amend his complaint for the limited purpose of adding the above allegations, including

16   the late Form 4 filings, the disclosure in Zoran's 8K statement, and the stock price's movement

17   between November 23, 2005, and November 30, 2005.  For all grants he alleges were

18   backdated, plaintiff should also take care to allege the stock-option plan under which they were

19   granted.  Once he does so, defendants' motion to dismiss will be deemed denied, and this action

20   can proceed.

21       In sum, plaintiff has pled that six of eight board members at the time of the complaint

22   received backdated stock options during the time that plaintiff held stock.  This is sufficient to

23   show that the board could not have responded in a disinterested manner to a demand, and thus

24   that demand was excused.  *Beam ex rel. Martha Stewart Living Omnimedia, Inc.*, 845 A.2d at

25   1046.  This is dispositive of the demand issue.  Once plaintiff adds allegations related to the

26   purported grant on November 23, 2005, he will prevail on the demand issue because of the

27   grant of backdated stock options.  Thus, this order need not address plaintiff's other four

28

1    theories of why demand was excused.  Once plaintiff makes conforming amendments to his

2    complaint, nominal defendant's motion to dismiss for failure to make demand will be **DENIED**.

3        **3.        STANDING.**

4        Defendants argue that for purposes of bringing a shareholder-derivative action, plaintiff

5    only has standing to assert claims based on wrongs that occurred while he held Zoran stock.

6    Plaintiff acquired his Zoran stock on August 11, 2003, through a merger.  To have standing,

7    plaintiff must have been a shareholder at the time of the transaction of which he or she

8    complains.  FRCP 23.1.  This rule is intended to prevent prospective plaintiffs from purchasing

9    shares in a corporation with an eye to filing a derivative suit.  *Daily Income Fund, Inc. v. Fox*,

10   464 U.S. 523, 532 n.6 (1984).  Some circuits, however, recognize an exception that where a

11   complaint alleges that the defendants are engaged in a continuing wrong, the plaintiff has

12   standing to maintain a claim for the entire course of the wrong, including events that occurred

13   prior to the plaintiff's acquiring stock in the company.  *Bateson v. Magna Oil Corp.*, 414 F.2d

14   128, 130 (5th Cir. 1969).

15       The Ninth Circuit has neither endorsed nor rejected the continuing-violation exception

16   in the context of a shareholder derivative suit.  Several decisions addressing this question have

17   held that plaintiffs may *not* maintain derivative claims based on backdated stock options granted

18   before they acquired their stock.  For instance, the Delaware court in *Ryan v. Gifford* dismissed

19   all of the plaintiffs' claims based on allegedly backdated grants occurring before the plaintiffs

20   acquired their stock in a merger.  The *Ryan* decision recognized that, under a similar standing

21   rule found in Delaware law, there is an exception analogous to the continuing-violation

22   exception but declined to apply it to backdating allegations.  918 A.2d at 358–59.  Federal

23   courts, including those in our district, have also declined to apply the exception, holding that the

24   plaintiffs do not have standing for allegedly backdated grants occurring before they acquired

25   their shares.  *In re Computer Sciences Corp. Deriv. Litig.* 2007 WL 1321715, *15 (C.D. Cal.

26   Mar. 27, 2007); *In re Novellus Sys. Inc. Deriv. Litig.*, No. C 06-3514 RW slip op. (N.D. Cal.

27   Mar. 23, 2007) (Lee Reply Decl. Exh. D).

28

United States District Court
For the Northern District of California

22

United States District Court

For the Northern District of California

Plaintiff cites to *Bilunka v. Sanders*, 1994 WL 447156, *2 (N.D. Cal. 1994) (Ware, J.), in support of his argument. In that decision, this Court applied the continuing-violation exception under Delaware law. There, the corporation had been sued, then made a material misstatement regarding the action, which it later corrected. All three events, the lawsuit, the misstatement, and the correction, occurred within a three-month period. The plaintiff purchased his shares between the misstatement and the correction. This decision is distinguishable because each grant of backdated stock options was an integrated transaction unto itself.

Furthermore, it would be a strange result indeed to give plaintiff standing for each claim asserted over a nine-year period when he only held shares for three years. Plaintiff alleges that the wrong was continuing, which may have been true. Plaintiff's allegation that the backdating scheme will not be complete until all the options have been exercised or cancelled seems a bit far-fetched in view of plaintiff's already having filed suit against defendants to achieve precisely the same result. Over the years, the options were received and granted by different people over their tenures at Zoran. Plaintiff even acknowledges this by pleading, at least for the purposes of individual liability, that not every defendant can be held liable for every breach of duty that occurred at Zoran in a nine-year period. Plaintiff cannot assert claims based on grants occurring before he acquired his stock. Even though plaintiff does not have standing to seek recovery for the corporation for transactions that occurred before August 11, 2003, he may still refer to grants before that date to establish that Zoran's management had a predisposition to engage in backdating.

Even though plaintiff only has standing for options grants occurring after August of 2003, he has successfully pled that directors Galil, Stabenow, Owens, Meindl, Rynne, and Young received backdated options on November 23, 2005. Although plaintiff has pled that demand was futile, plaintiff only has standing to assert claims regarding events occurring after he acquired stock.

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PART TWO**

1.    **MERITS OF SECURITIES LAW CLAIMS.**

This order now turns to the merits of plaintiff's securities law claims.  Del Rosario alleges claims under Sections 10(b) and Section 20(a) of the 1934 Act against defendants Gerzberg and Schneider.  He alleges violations of Section 14(a) of the 1934 Act against the audit committee defendants and the compensation committee defendants.

In complaints that do not allege fraud, plaintiffs need only make "a short and plain statement of the claim showing that the pleader is entitled to relief."  FRCP 8(a)(2).  Allegations of fraud, however, must meet the heightened pleading standards of Rule 9(b).  These require allegations of particular facts going to the circumstances of the fraud, including time, place, persons, statements made and an explanation of how or why such statements are false or misleading.  *In re Glenfed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547–48 & n.7 (9th Cir. 1994) (en banc).

In addition, the Private Securities Litigation Reform Act of 1995 requires plaintiffs alleging violations of the 1934 Act to specify each misleading statement, to explain why the statement was misleading and, if an allegation is made on information and belief, to list all facts upon which that belief is formed.  15 U.S.C. 78u-4(b)(1).  The complaint must also state with particularity facts giving rise to a "strong inference" that the defendant knowingly or with deliberate recklessness made false statements or omitted a material fact.  15 U.S.C. 78u-4(b)(2); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999).

These PSLRA requirements are in "inevitable tension [with] . . . the customary latitude granted the plaintiff on a motion to dismiss . . . ."  *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002).  In considering whether to dismiss a 1934 Act claim, a court is not required to draw all reasonable inferences in the plaintiff's favor, as it is for most Rule 12(b)(6) motions.  *See Usher v. City of L.A.*, 828 F.2d 556, 561 (9th Cir. 1987).  The court instead must consider all reasonable inferences, whether unfavorable or favorable to the plaintiffs.  *Gompper*, 298 F.3d at 896.  Furthermore, the court is not required "to accept legal conclusions cast in the form

1   of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged."

2   *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754–55 (9th Cir. 1994).

3   **A.    Section 10(b).**

4       Del Rosario alleges that individual defendants Gerzberg and Schneider violated

5   Section 10(b) and Rule 10b-5.  Plaintiff must plead:  (1) that defendants made a material

6   misrepresentation or omission; (2) the misrepresentation was in connection with the purchase or

7   sale of a security; (3) that the misrepresentation caused plaintiff's loss; (4) that plaintiff relied

8   on the misrepresentation or omission; (5) that defendants acted with scienter; and (6) that

9   plaintiff suffered damages.  Each of these elements must be pled for each defendant.  *See Dura*

10  *Pharm. v. Broudo*, 544 U.S. 336, 341–42 (2005).

11      To summarize the claim, plaintiff alleges that because of the backdating, Gerzberg and

12  Schneider misrepresented to Zoran itself that stock options were being granted at fair market

13  value and that the options were being accounted for properly.  Zoran then relied on these

14  misrepresentations (including the bogus paperwork) in making stock-option grants to officers

15  and directors.  It suffered harm because those options should have fetched the higher price

16  associated with the true grant date.  This is not like the typical case where the victim is a

17  purchaser.  Here, the victim is the seller, defrauded into parting with its shares at a lower price

18  than was right.  Still, the 1934 Act covers such transactions.  *See Affiliated Ute Citizens of*

19  *Utah v. United States*, 406 U.S. 128, 151–53 (1972).  The specific elements are now examined.

20  **(1)    *Material Misstatement or Omission*.**

21      "[S]ubstantial participation or intricate involvement in the preparation of fraudulent

22  statements is grounds for primary liability even though that participation might not lead to the

23  actor's actual making of the statements."  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n.5

24  (9th Cir. 2000).  Furthermore, employees and directors who sign or prepare financial

25  disclosures can be held liable for misstatements and omissions therein.  *Ibid*.

26      As described above, plaintiff has pled that some of the grants were backdated.  Though

27  Schneider was not a board member, former Zoran employees had observed that both defendants

28  were personally involved in administering option grants.  Plaintiff also pleads that Gerzberg and

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    Schneider both knowingly signed false and misleading financial statements and Sarbanes-Oxley

2    certifications.  The financial statements falsely stated that Zoran was in compliance with proper

3    accounting procedures and that compensation expenses were being properly accounted for.  As

4    CEO and CFO of Zoran, Gerzberg and Schneider were responsible for the accuracy of the

5    statements that they signed.  As to materiality, plaintiff has pled that Zoran had to restate its

6    financials and was facing delisting by NASDAQ as a result of the alleged misstatements and the

7    accompanying delays in filing financial statements.  Zoran's latest Form 10K shows that it has

8    had to recognize a charge of twelve to fifteen million dollars in compensation expenses.

9    Accordingly, plaintiff has pled that defendants made material misstatements under this element.

10              **(2)      *Transactional Causation and Reliance*.**

11              This Section 10(b) claim is brought as a derivative action so it does not resemble the

12   classic securities case.  Generally, a plaintiff buys or sells securities in reliance on a false

13   statement.  In a derivative action, however, the true plaintiff is the corporation; the shareholders

14   bringing the action merely stand in the corporation's shoes.  Thus, to plead the element of

15   reliance, plaintiff has to plead that *Zoran itself*, and not the named plaintiff, relied on

16   defendants' misrepresentations or omissions.  This in turn creates unique issues with respect to

17   the "in connection with" and loss causation elements of plaintiff's Rule 10b-5 claim.

18              A stock option is a sale of securities sufficient to fulfill the "in connection with" the sale

19   of securities element.  *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1129–30 (9th Cir. 2002).  In

20   exchange for good corporate behavior or the promise of future good performance, the company

21   gives its employees the right to buy stock at a certain price.  Moreover, the Supreme Court has

22   endorsed a broad interpretation of the "in connection with" element.  *SEC v. Zandford*,

23   535 U.S. 813, 819 (2002) (holding that a misrepresentation need not affect the value of a

24   security to be "in connection with"); *Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*,

25   532 U.S. 588, 596 (2001) (holding that representation coupled with secret intent not to complete

26   the sale was sufficient to plead the "in connection with" element).

27              Next, plaintiff must plead that Zoran (the corporation), as the true plaintiff, relied on the

28   individual defendants' misrepresentations in granting the options.  *See Dura Pharm., Inc.*, 544

1   U.S. at 341–42.  "[T]he fraud is in connection with the securities transaction if it coincides with

2   the transaction."  *Falkowski*, 309 F.3d at 1130.

3        Here, plaintiff sums up his allegations as to reliance and transactional causation in a

4   single sentence.  "Because the Company provided the shares in exchange for the artificially low

5   prices set by Defendants, it relied on false statements regarding their value and compliance with

6   the plans" (Opp. 29).  Simply put, the corporation was defrauded by Gerzberg and Schneider, its

7   officers, who caused it to sell stock to its officers and directors for less than the corporation was

8   entitled to receive for those shares, at least as to the options exercised.  As to unexercised

9   options, Zoran was defrauded by Gerzberg and Schneider by causing it to award options of

10  more value to the recipient than authorized.  These options were outside all plans and could

11  have ordinarily fetched a higher price in the market.  For both exercised and unexercised

12  options, one damage item caused by the transaction was the loss to the corporation.

13       Only Gerzberg and Schneider are named as defendants in plaintiff's Section 10(b) claim.

14  Gerzberg served on the board and as chief executive officer, while Schneider served as chief

15  financial officer.  Elsewhere in the complaint, plaintiff has pled that the compensation

16  committee, no current or former member of which is named as a defendant for this claim, bore

17  the ultimate responsibility for selecting grant dates.  As to Gerzberg and Schneider's

18  involvement, plaintiff cites two confidential witnesses.  The first was a human resources

19  benefits administrator who states that all stock options had to be pre-approved by Gerzberg

20  before they were granted (Compl. ¶ 23 n.2).  He both determined the number of options to be

21  granted and gave ultimate approval to the grants.  The second witness worked at Zoran as an

22  executive assistant and states that Schneider was "integral in every aspect of the options grant

23  process, along with the Chief Operating Officers, Defendants Aharon and Martino, and the

24  Board of Directors itself" (*id*. at ¶ 26 n.3).  Plaintiff has pled that Gerzberg and Schneider

25  exercised authority in setting option prices.  Assuming all of the foregoing to be true, plaintiff

26  has adequately pled that Zoran relied on Gerzberg and Schneider's false representations that the

27  grants were at-the-money as of the measurement date.  Plaintiff has pled the elements of

28  transactional causation and reliance.

27

**United States District Court**
For the Northern District of California

**(3)   *Scienter*.**

When the complaint seeks damages under the 1934 Act, as here, plaintiffs "shall, with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. 78u-4(b)(2). The state of mind required to sustain an action under Section 10(b) and Rule 10b-5 is one that embraces an "intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976), or which is "deliberately reckless," *In re Silicon Graphics Inc.*, 183 F.3d at 974. The Ninth Circuit has held that scienter is properly alleged when the complaint alleges both false statements and the defendants' close involvement in the preparation of those statements. *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1022–24 (9th Cir. 2005).

Plaintiff first alleges that Gerzberg and Schneider were "involved" in granting backdated options. Gerzberg and Schneider, by virtue of their roles as chief executive officer and chief financial officer, allegedly must have known, or had been involved in the alleged backdating scheme. Simply pleading that defendants surely would have known that the statements were false by virtue of their positions at the company is not automatically sufficient to show a strong inference of deliberate recklessness. *In re Read-Rite Sec. Litig.*, 115 F. Supp. 2d 1181, 1184 (N.D. Cal. 2000), *aff'd*, 335 F.3d 843, 848–49 (9th Cir. 2003) (affirming trial court's holding that reference to "job duties" could lead to a "reasonable inference," but not the strong inference of scienter needed to satisfy the PSLRA). As discussed above, however, plaintiff goes on to plead that Gerzberg and Scheider gave approval to options grants and oversaw the options-granting process. Indeed, plaintiff has alleged, on information from a confidential witness, that Gerzberg gave final approval of options grants. Assuming that to be true, at the very least, Gerzberg would have noticed if the grant dates were bogus even if he had not been involved in setting them himself. Plaintiff also pleads that Schneider was integral in the process as well.

Plaintiff then alleges that Gerzberg and Schneider's preparing and signing false or misleading proxy statements show evidence of scienter. "When a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the

**United States District Court**
For the Northern District of California

1   officer believes that the statements in the documents are true." *Howard*, 228 F.3d at 1061.

2   Plaintiff has here pled specific facts that Gerzberg and Schneider exercised supervision and

3   control over the options-granting process.  In their respective roles at Zoran, Gerzberg and

4   Schneider were required to review, certify and sign financial disclosure statements.

5   Additionally, from plaintiff's confidential witnesses, Gerzberg and Schneider were intimately

6   involved in deciding when and to whom options would be granted.  Indeed, Gerzberg allegedly

7   exercised final approval over options grants.  If Gerzberg and Schneider had been so involved

8   with granting options as plaintiff pleads, they would have either known, or been deliberately

9   reckless in not knowing, that stock options were not being issued at fair market value on the

10  date of the grant.  Thus, plaintiff has pled facts that, if proven true, would show a strong

11  inference of the required state of mind.  Plaintiff has pled that defendants acted with scienter.

12  Defendants' motion to dismiss this claim is **DENIED**.

13                    **(4)**    *Statute of Limitations.*

14          Defendants contend that many of plaintiff's Section 10(b) claims are barred by the

15  statute of limitations.  Under the Sarbanes-Oxley Act of 2002, the statute of limitations for a

16  claim brought under Section 10(b) of the 1934 Act is two years from the discovery of facts

17  constituting the violation but no more than five years from the date of the violation.  28 U.S.C.

18  1658(b)(1)(2).  The outer limitations period in a Section 10(b) claim serves as a statute of

19  repose in lieu of equitable tolling.  *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501

20  U.S. 350, 363 (1991).

21          Plaintiff's first complaint was filed on September 7, 2006, so defendants argue that any

22  claims arising from events more than five years prior, or September 7, 2001, are time-barred.

23  Individual defendants also argue that the two-year inquiry notice period should apply.  The

24  Ninth Circuit has not resolved the question of whether inquiry notice or actual notice applies,

25  and so applies both standards.  *Livid Holdings v. Salomon Smith Barney, Inc.*, 416 F.3d 940,

26  951 (9th Cir. 2005).  Defendants argue that the exercise price of all stock options granted by

27  Zoran was disclosed in proxy statements for the relevant years.  The too-low grant price of the

28  options was the key fact that should have tipped our plaintiff off to the fact that something was

1   rotten at Zoran.  The question then becomes, too low compared to what?  The reason that the

2   price was too low was because the true date of the grant was allegedly changed after the fact.

3   The key fact was not the price itself, it was the true date of the grant.  Outsiders like plaintiff did

4   not have superpowers to detect secret backdating inside the company.  Under either standard,

5   the two-year statute of limitations does not apply.

6        A Delaware Court reached a similar conclusion in *Ryan v. Gifford*, 801 A.2d at 359.

7   The court held that the plaintiffs could not have uncovered backdating by themselves through

8   diligence.  "Shareholders may be expected to exercise reasonable diligence with respect to their

9   shares, but this diligence does not require a shareholder to engage in complicated statistical

10   analysis in order to uncover alleged malfeasance."  *Ibid.*  Agreed.  The exercise prices were

11   public information, as was the stock's performance immediately after grant dates.  Plaintiff was

12   under no obligation, however, to connect the two or notice that something was suspicious.

13   Accordingly, the five-year statute of repose applies, at least at the pleading stage.

14        Plaintiff argues that none of his claims should be time-barred because each material

15   misstatement was part of an ongoing scheme dating as far back as 1997.  As such, the statute of

16   limitations for the entire scheme should be tolled from the last misleading statement, which

17   occurred in 2006, as plaintiff alleges, and that each new false statement "revitiates all claims

18   against those who were even partially responsible for it" (Opp. 20).  This argument is rejected.

19   "[A] statute of limitations [for a Section 10(b) claim] ordinarily begins to run when an act

20   occurs that gives rise to liability . . . ."  *Asdar Group v. Pillsbury, Madison, and Sutro*, 99 F.3d

21   289, 294–95 (9th Cir. 1996).  Accordingly, the statute of limitations accrues as of when the

22   violation itself occurs, not when the last violation in a series of alleged violations occur.

23        The decisions the plaintiff cites in his favor are not binding here.  Furthermore, both of

24   them involved continuous, integrated schemes that were operated by the same group of people

25   over a period of time to achieve the same purposes.  *In re Dynex Capital, Inc. Sec. Litig.*, 2006

26   WL 314524, at *5 (S.D. N.Y. Feb. 10, 2006); *Quaak v. Dexia, S.A.*, 357 F. Supp. 2d 330, 338

27   (D. Mass. 2005).  Plaintiff's assertion that each new false statement revives all previous ones is

28   tenuous at best.  Backdated options were allegedly granted over a period totaling nine years.

United States District Court

For the Northern District of California

1    Although plaintiff does plead that defendants kept making false statements about their past

2    options grants, that simply does not connect nine years worth of option grants.  Accordingly, the

3    five-year statute of repose applies, and any claims alleging events before September 7, 2001, are

4    time-barred, at least at the pleading stage.

5                **B.    Section 20(a).**

6           As with plaintiff's claim under Section 10(b), this claim for control-person liability

7    under Section 20(a) of the 1934 Act is asserted against only Gerzberg and Schneider.  15 U.S.C.

8    78t(a).  To state a claim under this section, plaintiff must allege that:  (1) there was a primary

9    violation of the securities laws; and (2) that the defendant exercised actual power or control

10   over the violator.  *Howard*, 228 F.3d at 1065.  The first requirement was addressed above.

11   Plaintiff has already pled that Gerzberg and Schneider were primary violators under Section

12   10(b).  Furthermore, plaintiff has not pled the existence of any other primary violators over

13   whom Gerzberg and Schneider could have exercised power or control.  Accordingly,

14   defendants' motion to dismiss this claim is **GRANTED**, and this claim must be **DISMISSED**.

15               **C.    Section 14(a).**

16          Plaintiff alleges this claim against the audit committee and compensation committee

17   defendants.  Specifically, he alleges that these individual defendants caused the company to

18   issue false proxy statements, a violation of Section 14(a) of the 1934 Act, 15 U.S.C. 78n(a).  To

19   plead a claim under Section 14(a), plaintiff must allege that:  (1) defendants made a material

20   misrepresentation or omission in a proxy statement; (2) with the requisite state of mind; and

21   (3) that the proxy statement was the transactional cause of harm of which plaintiff complains.

22   *See Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 384 (1970).  Plaintiff must also plead that

23   "the misstatement or omission was made with the requisite level of culpability and that it was

24   an essential link in the accomplishment of the proposed transaction."  *Desaigoudar v.*

25   *Meyercord*, 223 F.3d 1020, 1022 (9th Cir. 2000).  "An omitted fact or misrepresentation in a

26   proxy statement is material when there is a substantial likelihood that a reasonable shareholder

27   would consider it important in deciding how to vote."  *TSC Indus., Inc. v. Northway, Inc.,* 426

28   U.S. 438, 449 (1976).

31

**(1)    *Misstatement and State of Mind*.**

Del Rosario alleges that each proxy statement issued between 1997 and 2005 contained material misstatements and omissions by misrepresenting option grant dates, stating that the board was complying with the stock option plans, and misstating compensation expenses and financial results.  A reasonable shareholder would consider information revealing self-dealing by the board material in deciding how to vote.  A reasonable shareholder would certainly want to know that the board was feathering the nests of insiders via backdated options to the detriment of stockholders at large.  Plaintiff has successfully pled this element.

The heightened pleading standards of the PSLRA do apply to claims under this section.  However, a state of mind of negligence will suffice as to the degree of culpability.  *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000).  Accordingly, del Rosario "must plead with particularity facts that give rise to a strong inference of negligence."  *Ibid*.  Here, plaintiff need not plead that defendants' conduct was knowing, but he must plead particular facts as to each defendants' negligence.

Defendants argue that plaintiff has not met this element and, instead, that plaintiff has merely recited boilerplate allegations that the compensation committee and audit committee defendants knew or should have known about the misstatements and omissions.  This argument ignores that these defendants had duties with respect to the grant of stock options and accounting practices within the company.  The compensation committee was given authority under the stock-options plans to administer the plans and to ensure compliance with them.  Specifically, they bore ultimate responsibility for ensuring that stock options were granted at fair market value on the date of the grant as well as deciding the grant dates for the options.  Elsewhere in the complaint, plaintiff has pled that this was not the case at Zoran.  Even if somehow these pled facts could lead to the inference that the compensation committee did not know that backdating was occurring, they certainly lead to the inference that the compensation committee neglected its duty and was thus negligent.

This argument applies with equal force to the audit committee defendants.  They were charged with ensuring compliance with accounting standards and making certain that Zoran's

United States District Court

For the Northern District of California

1    financial statements and proxy statements were correct and accurate.  Even if they did not know

2    backdating was occurring, under these pleaded facts, they have still shirked their duties.  Thus,

3    plaintiff has successfully pled this element of his claim.

**(2)    *Essential Link*.**

5          The final element is a greater hurdle for plaintiff.  He must plead that the proxy

6    solicitation itself was an essential link in accomplishing the transaction.  The plaintiff must

7    show that "the proxy solicitation itself, rather than the particular defect in the materials, was an

8    essential link in the accomplishment of the transaction."  *Mills*, 396 U.S. at 385.  Because this is

9    a derivative action, the harm caused by the transaction must have accrued to Zoran.

10         Plaintiff essentially pleads that the directors used the proxy solicitations to maintain

11   their positions on Zoran's board.  Shareholders allegedly kept voting for the board members in

12   blissful ignorance of the scheme to grant insiders backdated options while shortchanging the

13   company.  Shareholders also authorized the stock-option plans under which the

14   allegedly-backdated options were granted.  With each election, the board could continue to

15   grant backdated stock options to itself and Zoran executives.  Zoran was damaged because

16   defendants caused it to divert company assets to recipients of backdated stock options.  Zoran

17   was also exposed to an inquiry by the SEC as a result and has allegedly suffered damage to its

18   reputation and investor confidence.  Had shareholders known that defendants had not followed

19   the dictates of the plan in the past, this likely would have changed their votes.

20         As to damages, plaintiff alleges that corporate assets were diverted to recipients of

21   backdated stock options causing additional compensation expenses and tax liabilities.  This in

22   turn allegedly exposed Zoran to liability from regulators (Compl. ¶ 55).  If defendants had not

23   falsely stated in Zoran's proxy statements that stock options were being granted properly under

24   the plans, and that directors were complying with the terms of the plans that the shareholders

25   approved, shareholders would have voted those board members out, and the board members

26   would no longer have had the means to grant more backdated stock options.  Whether or not all

27   of these damage items are compensable under Section 14(a) is for another day — for now, this

28   order refuses to hold that no damages whatsoever could be shown.

United States District Court

For the Northern District of California

1    Plaintiff has pleaded the elements for a claim under Section 14(a) of the 1934 Act.

2   Individual defendants' motions to dismiss are **DENIED** to the extent the claims are not barred by

3   the applicable statute of limitations, discussed below.

4                          **(3)    *Statute of Limitations*.**

5    A Section 14(a) claim is not a claim that "sounds in fraud" under the Sarbanes-Oxley

6   Act of 2002, so its statute of limitations was not extended by 28 U.S.C. 1658(b)(2).  Thus, the

7   statute of limitations is one year from the discovery of the occurrences giving rise to the claim,

8   but no later than three years from the date of the violation.

9    Defendants contend that the one-year statute of limitations applies because all the core

10   facts of the violation, such as the exercise price and date of the option, were public knowledge.

11   Plaintiff again contends that each proxy statement was part of a larger scheme.  As in the prior

12   analysis for the statute of limitations for Section 10(b) claims, both of these arguments are

13   rejected.  Although the time limits are different, the limitations period operates in the same

14   manner.  Accordingly, the three-year statute of repose applies.  Any claims arising from proxy

15   statements filed prior to September 7, 2003, are barred, and must be dismissed.  Thus, the only

16   proxy statements arguably in play are those from 2003 through 2005.

17          **2.    MERITS OF DELAWARE STATE-LAW CLAIMS.**

18              **A.    Breach of Fiduciary Duty.**

19    Plaintiff alleges that defendants breached their fiduciary duties to Zoran in two ways.

20   *First*, each individual defendant granted or received backdated stock options.  *Second*, plaintiff

21   alleges insider trading against the insider-selling defendants.

22                    **(1)    *Granting and Receiving Backdated Stock Options*.**

23    "Intentional violation of a shareholder approved stock option plan, coupled with

24   fraudulent disclosures regarding the directors' purported compliance with the plan, constitutes

25   conduct that is disloyal to the corporation and is therefore an act in bad faith."  *Ryan*, 918 A.2d

26   at 357–58.  As described above, plaintiff has pled exactly this, at least as to the compensation

27   committee.  It had the sole authority to decide option-grant dates and to ensure that options

28   were being granted at fair market value on the date of the grant.  At least that is a reasonable

United States District Court

For the Northern District of California

1    inference at the pleading stage.  Plaintiff has alleged that the committee did not comply with the

2    stock-options plans by granting backdated stock options.  The compensation committee

3    defendants then falsely represented to shareholders that the company was complying with the

4    plan by preparing and signing financial statements and proxy statements.

5        Defendants argue that the audit committee defendants and the compensation committee

6    defendants are immunized by the exculpatory provisions of Zoran's corporate charter.  "Where

7    the factual basis for a claim *solely* implicates a violation of the duty of due care, this court has

8    indicated that the protections of such a charter provision [exculpating directors for breach of

9    duty of care] may be properly invoked and applied."  *Emerald Partners v. Berlin*, 726 A.2d

10   1215, 1224 (Del. 1999) (citing *Arnold v. Soc'y for Savings Bancorp*, 650 A.2d 1270, 1288 (Del.

11   1994)).  Here, plaintiff has alleged that the directors authorized the grant of backdated options

12   to themselves and Zoran officers.  This was self-dealing and a violation of the duty of loyalty,

13   not due care.  If the facts that plaintiff has pled are taken as true, the exculpatory provision will

14   give individual defendants no quarter.  Thus, plaintiff has stated a claim for breach of fiduciary

15   duty for granting backdated stock options.  Defendants' motion is **DENIED** as to this claim.

### (2)    *State-Law Insider Trading.*

17       To plead a claim for insider trading under Delaware state law, plaintiff must plead that

18   "(1) the corporate fiduciary possessed material, nonpublic company information; and (2) the

19   corporate fiduciary used that information improperly by making trades because she was

20   motivated, wholly or in part, by the substance of that information."  These elements are similar

21   to what is required for insider-trading claims under federal law.  *In re Oracle Corp. Deriv.*

22   *Litig.*, 867 A.2d 904, 934 (Del. Ch. 2004), *aff'd* 872 A.2d 960 (Del. 2005).

23       Plaintiff has successfully pled that the insider-selling defendants possessed material,

24   nonpublic information.  Taking the pled facts as true, the directors knew that Zoran was

25   overstating its net revenue by understating its compensation expenses; the public did not know

26   this.  Turning to the second element, plaintiff alleges that the insider defendants sold stock in

27   certain amounts over a nine-year period.  It can be assumed, however, that here defendants

28   knew that they were getting a great deal not available to the public and shareholders.  If they

1   knew the stock options were backdated, then they knew that the options in effect were granted

2   in-the-money.  They also knew that for all the relevant years that backdating was occurring at

3   Zoran, the company's stated earnings were higher than its true earnings.  That is, the company

4   was not quite so robust as it appeared to the public.  Accordingly, plaintiff has pled that the

5   insider-selling defendants were motivated by the non-public information they possessed.

6   Defendants' motion is **DENIED** as to this claim.

**B.     Aiding and Abetting Breach of Fiduciary Duty.**

8        Del Rosario alleges that the audit committee and compensation committee defendants

9   aided and abetted the breach of fiduciary duty.  To plead a claim for aiding and abetting breach

10  of fiduciary duty, plaintiff must plead:  (1) the existence of a fiduciary relationship; (2) breach

11  of duty by a fiduciary; (3) that a defendant, who is not a fiduciary, knowingly participated in the

12  breach; and (4) damages from their concerted action.  *Jackson Nat. Life Ins. v. Kennedy*, 741

13  A.2d 377, 386 (Del. Ch. 1999).  Plaintiff has not pled the existence of a defendant who is not

14  already a fiduciary who participated in the breach.  All of the audit committee defendants and

15  the compensation committee defendants are fiduciaries by virtue of being on the board.  This

16  problem is not addressed in plaintiff's opposition.  Defendants' motion as to this claim is

17  **GRANTED**, and this claim is **DISMISSED**.

**C.     Unjust Enrichment.**

19       This claim is alleged against the officer defendants and the insider-selling defendants.

20  The elements of a claim for unjust enrichment are:  "(1) an enrichment, (2) an impoverishment,

21  (3) a relation between the enrichment and the impoverishment, (4) the absence of justification,

22  and (5) the absence of a remedy provided by law."  *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d

23  571, 585 (Del. Ch. 1998).  In the backdating context, plaintiff need not allege the true value of

24  the stock-options grants to defendants to survive a motion to dismiss.  *Ryan*, 918 A.2d at 361.

25  Plaintiff has pled that insider-selling defendants benefitted from receiving backdated stock

26  options.  The company was harmed because it was receiving less than it otherwise would for

27  those stock options.  Plaintiff also alleges that there was no justification for doing so, and that

28  there is no adequate remedy at law.

United States District Court

For the Northern District of California

In response, defendants argue that plaintiff has pled no specific facts as to how much profit insider-selling defendants received from the allegedly backdated stock options.  There are no allegations as to the true strike price of the options, the number of options that were exercised, or that any backdated options were sold by defendants.  Such facts are not necessary at the pleading stage and are issues to be resolved after discovery.  Accordingly, defendants' motion to dismiss as to this claim is **DENIED**.

### D.    Corporate Waste.

Del Rosario alleges a claim for corporate waste against all individual defendants.  Under Delaware law, a plaintiff is required to "allege facts showing that no person of ordinary sound business judgment could view the benefits received in the transaction as a fair exchange for the consideration paid by the corporation."  *Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 892 (Del. Ch. 1999).  Unless there is a reasonable doubt that the board was proceeding in the corporation's best interest, the board's decisions are entitled to deference.  *White v. Panic*, 783 A.2d 543, 554 (Del. 2001).  Any directors engaging in self-dealing and making misrepresentations to shareholders cannot be said to act in the corporation's best interest. Backdating is a form of fraud.  In the face of such allegations, defendants simply cannot be said to have acted in the company's best interest.  Accordingly, plaintiff has pled a claim for corporate waste under Delaware law.  Defendants' motion as to this claim is **DENIED.**

### E.    Constructive Fraud, Abuse of Control, Gross Mismanagement, and Rescission Claims.

Plaintiff alleges each of these claims against all individual defendants.  Plaintiff does not, however, appear to oppose defendants' motion as to these claims.  Moreover, these claims are often considered a repackaging of claims for breach of fiduciary duties instead of being a separate tort.  *See Clark v. Lacy*, 376 F.3d 682, 686–87 (7th Cir. 2004).  Additionally, rescission is a form of remedy, not a claim under the law.  As to these claims, defendants' motion to dismiss is **GRANTED**, and these claims are **DISMISSED**.

### F.    Statute of Limitations.

The statute of limitations under Delaware law for plaintiff's derivative claims is three years.  10 Del. C. § 8106.  "The statute of limitations begins to run at the time the alleged

1  harmful act is committed, regardless of plaintiff's knowledge of the harmful act.  Plaintiff,

2  however, may toll the limitations period by specifically alleging that the facts were 'so hidden

3  that a reasonable person could not have made timely discovery of an injury necessary to file a

4  complaint.'"  *Ryan*, 918 A.2d at 359.  As with the statute of limitations for plaintiff's federal

5  claims, defendants argue that all of the information necessary to plead the facts in the

6  complaint, such as stock prices and purported option grant dates, was a matter of public record.

7  As with plaintiff's federal claims, however, plaintiff was under no duty to conduct the kind of

8  analysis necessary to uncover backdating particularly in view of defendants' alleged efforts to

9  conceal it.  Accordingly, the earliest that plaintiff should have been on notice of his claim was

10  in May 2006, so his state-law claims are not time-barred.

**CONCLUSION**

12  For all of the above-stated reasons, plaintiff's motion to strike is **GRANTED IN PART.**

13  Plaintiff is granted limited leave to amend to add allegations related to the purported grant on

14  November 23, 2005, as described above.  This must be done no later than **JUNE 19, 2007**.  Once

15  he does so, nominal defendant's motion to dismiss for failure to make a demand will be deemed

16  **DENIED.**  Individual defendants' motion to dismiss is **GRANTED** as to the claims under

17  Section 20(a) of the 1934 Act, and the Delaware state-law claims for aiding and abetting breach

18  of fiduciary duty, constructive fraud, abuse of control, gross mismanagement and rescission.

19  Individual defendants' motion to dismiss is **DENIED** as to plaintiff's claims under Section 10(b)

20  and Section 14(a) of the 1934 Act, and his Delaware state-law claims for breach of fiduciary

21  duty, insider trading, unjust enrichment, and corporate waste.  With respect to the dismissed

22  claims, the Court sees little point in allowing leave to amend.  If, however, plaintiff desires

23  another opportunity to plead, plaintiff must file a motion seeking leave to amend specifying the

24  basis for a new pleading.  Any such motion must be filed no later than **JUNE 19, 2007**.

25  Discovery is no longer stayed.

26  **IT IS SO ORDERED.**

27  Dated:  June 5, 2005.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE